**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| MUHAMMAD NUMAAN IMAM; and KHADIJAH MANSOOR,<br><br>*Plaintiffs,*<br><br>v.<br><br>MARKWAYNE MULLIN, *in his official capacity as Secretary of the Department of Homeland Security,*<br><br>*Defendant.* | **CASE NO.** ________________ |

**DECLARATION OF PLAINTIFF MUHAMMAD NUMAAN IMAM IN SUPPORT OF MOTION FOR RETURN OF ELECTRONIC DEVICES UNLAWFULLY SEIZED BY CUSTOMS AND BORDER PROTECTION, AND FOR RETURN OF ANY CONTENT OBTAINED THEREFROM, PURSUANT TO FED. R. CRIM. P. 41(g)**

I, Muhammad Numaan Imam, declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following is true and correct to the best of my knowledge.

1. I was born in the United States and am a natural born U.S. citizen. I am a Florida resident working under a contract in Virginia. I am 35 years old. I am married and have one young child.

2. My wife, Khadijah Mansoor, and I have been married for approximately two years. She is also a Florida resident and lives with me in Virginia. She is 25 years old. Khadijah has been a permanent resident of the United States since June 2024. She is a citizen of Pakistan.

3. I am a psychiatric nurse practitioner. I work for an outpatient psychiatric practice in Norfolk, Virginia.

4. I have never been convicted of any criminal offense, misdemeanor or felony.

5. To my knowledge, neither Khadijah nor I are the subject of any pending criminal investigation, and there is no search warrant, arrest warrant, or other judicial process authorizing the seizure or continued retention of my electronic devices.

6. Khadijah and I regularly travel internationally for pleasure. During the past five years, we have traveled to countries including Canada, Pakistan, Azerbaijan, and Saudi Arabia.

7. On October 15, 2026, we departed from Dulles International Airport in Virginia for a family trip to Istanbul, Turkey with our 12-month-old son. We traveled on Turkish Airlines Flight Number TK188, which took approximately nine hours.

8. On October 16, 2026, we arrived in Istanbul and Khadijah realized that she had forgotten her United States Permanent Resident card at home.

9. The Turkish border authorities did not allow Khadijah to enter Turkey with only her Pakistani passport. They did not accept a photo of Khadijah's United States permanent resident card on her phone. As a result, Khadijah had to return home to the United States.

10. As United States citizens, my son and I were both allowed to enter Turkey but chose instead to return to the United States with Khadijah.

11. After approximately ten hours at the Istanbul Airport first discussing our situation with Turkish authorities and then booking and waiting for a flight home, Khadijah, our baby, and I traveled from Istanbul, Turkey back to Dulles International Airport in Virginia on Turkish Airlines Flight Number TK0007, which took approximately twelve hours.

12. On October 16, 2026, at approximately 9:45 p.m. Eastern Daylight Time, we arrived at Dulles International Airport in Virginia after more than 30 hours of travel with our baby son. We were exhausted from the long journey, caring for our baby in uncomfortable circumstances, and lack of sleep.

13. When we entered customs screening at Dulles International Airport, a United States Customs and Border Protection (CBP) officer asked for my American passport and Khadijah's Pakistani passport. He questioned us together. We told the CBP officer that Khadijah had forgotten her United States Permanent Resident card, which forced us to return home. The CBP officer informed me that I had been flagged in the CBP system. I do not know why I was flagged and he provided no explanation.

14. The CBP officer placed my American passport and Khadijah's Pakistani passport in a locked box. He instructed us to go to a secondary screening area. This was a controlled waiting-and-interview area with separate spaces for more private interviews or additional examinations. We handed the locked box to the CBP officer who met us and then sat down. There were approximately 10 CBP officers present.

15. After waiting approximately 20 minutes, one of the CBP officers took me to an interview space and asked me where I worked, whether I had any social media accounts, and about friend groups that were on my phone. I replied that I was a psychiatric nurse practitioner. The CBP officer asked me to name the group chats I participated in and I responded that I could not recall their names as several were inactive. This questioning lasted for approximately 20 minutes.

16. After questioning, a CBP officer accompanied me to baggage claim where I retrieved our checked-in bags, and we returned to the secondary screening room where Khadijah and our baby were waiting.

17. When I returned with our baggage, three CBP officers then took us to a space within the secondary screening room with our two checked-in bags, two carry-on bags, a baby bag, and a bag containing a baby stroller. The officers inspected each item and put the stroller bag through a

baggage scanner machine. The CBP officers expressed sympathy that our trip had been cut short and that we had to return home.

18. The CBP officers separated me from Khadijah. Two CBP officers inspected my baggage and asked me questions while another CBP officer inspected Khadijah's baggage. While inspecting my bag, they asked me to hand over my electronic devices, so I placed my iPhone 16 on the table and informed them that my laptop was in my carry-on bag. After inspecting our luggage, CBP officers asked me for the passcode for my phone. I politely explained that due to my profession as a psychiatric nurse practitioner, there was confidential patient information on my phone that I was professionally and ethically required to protect, so I declined to provide my passcode. They informed me that I was no longer permitted to touch my phone, which was still on the table.

19. The CBP officers responded that the Fourth Amendment did not protect my phone in this situation. They also said that they had technology that could filter HIPAA-protected patient information, which CBP lawyers would review and decide what to do from there.

20. I told the CBP officers that I wanted to speak with my lawyer to understand the law and my rights before proceeding. The CBP officers replied to the effect, *your lawyer cannot do anything. We are the authorities at the border.*

21. I politely declined to provide the passcode to my phone and explained that I was required to protect my patients' confidentiality and dignity. I was also concerned about my own personal information and privacy.

22. At that point, a CBP supervisor was brought to the area to persuade me to give up the passcode to my phone. The supervisor told me that HIPAA did not apply here. One of the CBP officers present then said, "okay, we are going to have to take the laptops then." The officers told

me and Khadijah to wait. While waiting, Khadijah and I explained that one of the two laptop computers belonged to Khadijah.

23. Approximately thirty minutes later, a second supervisor arrived and told us that they could do things the easy way or the hard way. That supervisor said that they could access all the information on our devices and that the process might take months. After confirming with me that it was a phone used for work, he said that confidential information could be filtered out, that confidentiality law protected me and my patients, and that CBP officers could be prosecuted if they violated confidentiality laws.

24. I repeated my concerns about protecting my patients' confidentiality and that I was declining to provide the passcode to my phone.

25. After I declined to give my passcode to the second supervisor, the CBP officers told Khadijah to hand over her phone. They never asked for her passcode.

26. CBP officers kept my iPhone 16, my MSI laptop computer, Khadijah's iPhone 16, and Khadijah's Microsoft Surface Pro laptop computer. They did not ask for our consent to keep these devices. I said repeatedly, I do not give consent. The CBP officers told us to wait in the seating area.

27. After we waited approximately 10 minutes, the CBP officers returned and provided each of us with a receipt. They provided contact information to inquire about our devices. They did not indicate how long they would hold our devices. At this point, they returned both my passport and Khadijah's passport.

28. After approximately three hours of questioning and inspections, CBP officers released me, Khadijah, and our baby at approximately 1:00 a.m. on October 17, 2026. We had to contact concerned family members without our phones and laptops. Without our phones or ability

to book a car rental online, we had to go to the car rental facility, which charged an additional fee. We finally rented a car and drove four hours home without phone navigation.

29. I have never been subjected to this sort of treatment reentering the United States in all my years of international travel. I was never taken into secondary screening before.

30. On October 17, 2026 at 1:37 p.m. I received an email from CBP informing me that my Global Entry membership had a status change. When I logged in online to my Trusted Traveler Program (TTP) dashboard, I was able to download a letter from U.S. Customs and Border Protection stating that my Global Entry membership had been revoked because I did not "meet the trusted traveler standard." The letter did not provide any further details, and I do not understand why I no longer meet the standard. I was previously approved for Global Entry on February 6, 2024 and maintained that status without any issue until October 17, 2026.

31. I need my phone as I am a psychiatric nurse practitioner and a 24/7 on-call provider at an American Society for Addiction Medicine (ASAM) Level 3.5 residential substance use treatment facility.

32. I am required to have 24/7 access to my phone for healthcare staff to contact me, to do telehealth visits, and on-call duties. As part of my on-call duties, I handle emergency calls from the facility regarding patients. In addition, federal rules require a second login step to e-prescribe controlled medications such as ADHD medications, benzodiazepines, and buprenorphine. That step always relies on an application on my phone and setting one up can take several days.

33. My phone contains sensitive mental health information and substance use treatment information for my patients. Without my phone, I am unable to access the login codes that are sent to my phone for bank and other accounts.

34. My phone also contains family photos, including our son's first year, as well as contacts and messages.

35. It would cost thousands of dollars and many hours to replace my phone and laptop and reset my established accounts that are tied to my phone.

Dated: 10/19/2026

Signed: M McOman